IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WOLF AVIATION NETWORK, INC.,<br>SASCHA WOLF, and CODY HODGINS,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF WESTFIELD,<br><br>Defendant. | ) | Civil Action No. 3:26-cv-12868 |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**I. NATURE OF THE ACTION**

1. This action concerns intentional unequal treatment and retaliation in the commercial operation of Westfield-Barnes Regional Airport ("KBAF" or the "Airport"). Wolf Aviation Network, Inc. ("Wolf") alleges that the City of Westfield (the "City") burdened or denied Airport access and opportunity because Wolf is owned and operated by LGBTQ persons and because Wolf and its representatives opposed discrimination and petitioned the government for redress.

2. The challenged course is not pleaded as a free-standing claim for professional discrimination or as a collection of ordinary disagreements over permits. It concerns specific leasing, tiedown, signage, referral, facility, and lease-continuity decisions. Wolf pleads protected-status discrimination and retaliation, and it pleads a narrow class-of-one claim based on the terminal-adjacent tiedown transaction as an independent alternative that does not require proof of anti-LGBTQ motive.

3. During the relevant period, Wolf and Fly Lugu, LLC ("Fly Lugu") were the only two flight-training providers operating at KBAF. Fly Lugu's earlier arrival may explain how a

historical arrangement began, but it did not make the businesses dissimilar for every later decision or confer a permanent right to preferential treatment after an agreement expired, where an agreement was nonexclusive, or when the City made a new discretionary allocation or lease decision.

4. On May 27, 2026, the Federal Aviation Administration ("FAA") issued a Director's Determination in Wolf Aviation Network, Inc. v. City of Westfield, Massachusetts, FAA Docket No. 16-25-15. The Director found that the City violated Grant Assurances 22 and 23 by failing to act concerning Atlantic Aviation's preferential treatment of Fly Lugu in the allocation of two terminal-adjacent tiedown positions. The Director expressly described Wolf as similarly situated to Fly Lugu for that transaction and found an exclusive right unsupported by a valid agreement granting exclusive use.

5. The Director dismissed the other Part 16 issues on the administrative record then presented. Wolf timely filed a limited administrative appeal on June 8, 2026 concerning Office 111, roadway signage, Wright Flight, fuel discounts, and the Airport's official Facebook page. The City separately appealed the findings entered against it. Those appeals remain pending. Wolf's limited appeal did not include the New England Air Museum ("NEAM") issue, the private Pilots of KBAF group, or towing. The FAA did not decide whether any act was motivated by LGBTQ status or adjudicate the constitutional and Massachusetts-law claims asserted here.

6. Where Wolf alleges a fact on information and belief, the inference rests on identified events, documents, statements, official roles, timing, and outcomes. The precise internal communications, selection criteria, recusal records, and approval history are held by the City or third parties and are not available to Wolf before discovery.

7. Because this action was filed on June 24, 2026, events before June 24, 2023 are pleaded as background where relevant to knowledge, intent, relationships among decisionmakers, and the meaning of later timely conduct. Each claim is asserted only to the extent timely under its governing limitations period, and Plaintiffs seek no double recovery.

## II. PARTIES

8. Wolf is a Massachusetts corporation with a place of business at 110 Airport Road, Suite 208, Westfield, Massachusetts. It provides flight-training and flight-simulation services at KBAF and directly suffered loss of access, opportunity, money, property, and competitive position from the conduct alleged below.

9. Sascha Wolf is Wolf's owner and principal and is a member of the LGBTQ community. He personally addressed City and Airport officials, participated in public processes, sought public records, and filed or supported administrative complaints. He asserts in Count III only injuries arising directly from retaliation against his own protected speech and petitions, not Wolf's corporate losses.

10. Cody Hodgins is Wolf's Operations Manager, a principal Airport-facing representative, and a member of the LGBTQ community. He personally participated in the disclosure, complaints, meetings, and petitions described below. He asserts in Count III only injuries arising directly from retaliation against his own protected speech and petitions, not Wolf's corporate losses.

11. The City is a Massachusetts municipal corporation that owns and operates KBAF through the Westfield Airport Commission (the "Commission"), Airport management, and other City officials.

## III. JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. Sections 1331 and 1343 because Counts I through III arise under the United States Constitution and 42 U.S.C. Section 1983.

13. This Court has supplemental jurisdiction over Counts IV and V under 28 U.S.C. Section 1367 because those claims form part of the same case or controversy.

14. The Court has personal jurisdiction over the City because the challenged conduct occurred in Massachusetts and concerned City property and governmental activity at KBAF.

15. Venue is proper under 28 U.S.C. Section 1391 because the City resides in this District and a substantial part of the events or omissions occurred in Westfield, Massachusetts.

16. The Court may grant declaratory relief under 28 U.S.C. Sections 2201 and 2202 and all other relief authorized by law.

## IV. MUNICIPAL AUTHORITY AND POLICY

17. Massachusetts General Laws chapter 90, Section 51E gives a municipal airport commission custody, care, and management of the municipal airport. It makes the airport manager the Commission's executive officer and makes the manager responsible to the Commission for operation and maintenance of the Airport and facilities under the manager's supervision.

18. Section 51F authorizes an airport commission to lease Airport land and facilities, including offices, other rental space, and concessions, on terms the commission prescribes. Section 51J requires the commission to adopt rules and regulations for use of the municipal airport and public safety.

19. Consistent with those statutes, the three-member Commission exercised final municipal authority over KBAF management, Airport leases, and material privileges under the

City's control. Airport management implemented, recommended, and reported on matters within that authority.

20. The challenged municipal conduct includes the Commission's May 2024 approval of Fly Lugu's Office 111 lease, the Airport approval required for Wolf's roadway-sign request, the City's response to Wolf's Office 111 and Office 208 requests, and the City's decision whether to correct the terminal-adjacent tiedown disparity after receiving actual notice.

21. The City delegated fixed-base-operator functions, including control of portions of the ramp and tiedown relationships, to Atlantic Aviation ("Atlantic") while retaining ownership, sponsor obligations, oversight, approval rights, and authority to require nondiscriminatory treatment at the public Airport.

22. The City's operative arrangement with its fixed-base operator required nondiscriminatory operation. The FAA found that the City failed to provide adequate oversight when Atlantic preferentially treated Fly Lugu in the tiedown transaction.

23. The City received actual notice of alleged unequal treatment through direct requests, Commission meetings, correspondence, the Massachusetts Commission Against Discrimination ("MCAD") matter, public-records activity, and the FAA proceeding. It had repeated opportunities to investigate and correct particular disparities.

24. On information and belief, the challenged decisions were made by the Commission, implemented by Airport management acting within delegated authority, or knowingly approved or ratified by officials with final authority over the subject. The Commission's transaction-specific decisions constitute municipal policy even apart from any broader custom.

25. Alternatively, the repeated use of unwritten and selectively applied Airport practices across leasing, signage, conflict handling, and delegated ramp access constituted a persistent municipal practice known to and maintained by officials responsible for those subjects.

26. Plaintiffs do not rely on respondeat superior. They challenge final Commission decisions, implementation by the Commission's executive officer and staff, and knowing municipal approval, ratification, or deliberate maintenance of particular unequal conditions after notice.

## V. FACTUAL ALLEGATIONS

### *A. Wolf's Operations, Protected Status, and Protected Activity*

27. In June 2021, Sascha Wolf opened a flight-simulation business at KBAF. During summer 2022, Wolf discussed expanding its authorized Airport operations to include flight training.

28. At the November 10, 2022 Commission meeting, Sascha Wolf and Cody Hodgins each personally disclosed that they were members of the LGBTQ community and that Wolf was LGBTQ-owned and LGBTQ-operated. The disclosure was made directly in the Commission setting and placed the Commission and Airport management on actual notice.

29. The City later approved Wolf's flight-training use, and Wolf's Office 208 lease was amended in January 2023 to permit flight-training activities. Plaintiffs do not contend that every City decision was adverse.

30. On June 30, 2023, Wolf filed a discrimination complaint against the City with MCAD, Docket No. 23SPR01669. Wolf later submitted amendments or supplemental allegations concerning additional unequal treatment and retaliation.

31. The MCAD matter was later withdrawn, after filing this federal complaint, without a final determination on the merits and is no longer pending. It produced no adverse probable-cause or merits finding concerning the allegations pleaded here.

32. Wolf, Sascha Wolf, and Cody Hodgins continued to complain to public officials, participate in public and administrative processes, seek records, and request corrective action. On November 27, 2025, Wolf filed its FAA Part 16 complaint, followed by supplemental filings.

33. Relevant Commission members and Airport personnel knew of Plaintiffs' protected complaints before later decisions concerning signage, tiedown and electrical access, leases, and tenant communications.

***B. The Only Two KBAF Flight Schools***

34. During the relevant period, Wolf and Fly Lugu were the only two businesses providing public flight training from KBAF and competed for the same general category of local flight-training customers.

35. For later Airport-access decisions, both provided flight instruction, operated training aircraft and instructors from KBAF, required access to Airport offices and aeronautical facilities, and operated under the same Commission, Airport management, and fixed-base-operator environment.

36. They need not be identical in every historical or financial detail. The relevant comparison is transaction specific and asks whether a difference mattered to the access, term, facility, or opportunity being allocated.

37. Fly Lugu's earlier arrival did not justify a perpetual preference when the City or its delegate made a new decision, an agreement had expired, or an agreement did not confer the exclusive right later asserted.

38. The Airport market supplied no additional flight-school comparator. Fly Lugu is the single available comparator because it was the only other KBAF flight school, not because Wolf selected it while ignoring materially closer businesses.

39. For the tiedown transaction in particular, the FAA independently found that the City allowed preferential treatment of Fly Lugu that unjustly discriminated against similarly situated Wolf.

### *C. Wright Flight and Michael Gutowski's Dual Role*

40. Western Massachusetts Wright Flight ("Wright Flight") operated an aviation-education program from KBAF and used a selected flight-school provider for recurring introductory flights. Those flights were compensated, although the exact payment and contracting mechanism is held in Wright Flight's and the provider's records.

41. In December 14, 2022, at a Wright Flight meeting separate from a Commission meeting, Sascha Wolf and Cody Hodgins asked Michael Gutowski whether Wolf could provide some of those compensated flights.

42. Gutowski responded in substance that Wright Flight would "stick with Fly Lugu." Sascha Wolf and Cody Hodgins both personally heard the statement. Other attendees were present and may be identified through Wright Flight's meeting, calendar, volunteer, or attendance records.

43. Gutowski gave no safety, qualification, capacity, price, performance, or neutral selection criterion for categorically declining to consider the only other KBAF flight school.

44. At the time, Gutowski simultaneously served as one of the three Airport Commissioners and as Wright Flight's president. Through his Commission role, he knew Wolf and Fly Lugu as Airport tenants and competitors and had access to Airport relationships and tenant information not available to an ordinary outside purchaser.

45. The statement occurred approximately one month after the November 10 disclosure. On information and belief, Gutowski knew of that disclosure through his Commission role and used Airport-derived knowledge when evaluating or communicating Wright Flight's provider decision.

46. Fly Lugu's preexisting relationship with Wright Flight may explain how its participation began, but it does not by itself explain a categorical refusal to evaluate future participation by the only other qualified Airport flight school under any disclosed neutral criterion.

47. Plaintiffs do not allege that overlapping titles alone made Wright Flight a City actor. They plead Gutowski's specific statement, timing, official-source knowledge, absence of disclosed separation or recusal, and the City's notice of the dual role as circumstantial evidence of motive, conflict handling, and the broader pattern.

***D. Roadway Signage and Unequal Process***

48. For approximately two years, Fly Lugu maintained roadside signage near the Airport without the approval or permit that the City later required Wolf to obtain, and Fly Lugu received the resulting commercial exposure during that period.

49. Wolf submitted a sign/permit application to the City’s Building Department on November 5, 2023. The application was denied on November 15, 2023 based on two points: 1) DPW approval required, and 2) Airport approval required. On November 16, 2023, Wolf submitted a banner permit application to the City’s Board of Public Works (“DPW”) and followed the process communicated by City personnel. The Board of Public Works addressed and approved the request on December 12, 2023, but the remaining Airport approval or Commission action did not follow and Wolf could not install the sign.

50. The two signs served the same commercial purpose: identifying and promoting an Airport flight-training provider to roadway traffic. The City did not identify a material safety, size, location, code, or business distinction that explained why Fly Lugu received years of exposure without completing the process applied to Wolf.

51. After Wolf complained, the unauthorized signs were removed. Removal ended future display but did not erase the completed period of differential exposure, compensate Wolf for that advantage, or explain why Wolf's application remained unresolved.

52. Wolf does not plead the sign dispute as the comparator transaction supporting Count II. It pleads the sequence as a specific post-MCAD event bearing on intent, retaliation, commercial-space treatment, and damages.

53. The City's requirement that Wolf satisfy applicable rules is not itself challenged. The challenged disparity is that the same rules were not enforced against Fly Lugu while Fly Lugu obtained the commercial benefit later withheld from Wolf.

### *E. Office 111 and Unequal Lease Continuity*

54. Fly Lugu obtained first-floor terminal Office 111 through a transfer in 2020, before Wolf leased Office 208 in June 2021. Wolf does not allege that the original 2020 placement denied an application Wolf had already made.

55. Office 111 is near the terminal entrance, restaurant, restrooms, bulletin board, and route to Atlantic. Wolf's Office 208 is upstairs at the end of a corridor and receives materially less walk-in exposure.

56. Fly Lugu's prior Office 111 lease thereafter lapsed, and Fly Lugu occupied the space for approximately seventeen months without an executed lease. The City nevertheless permitted the occupancy and, on May 9, 2024, approved a new three-year lease without a neutral solicitation.

57. By May 2024, Wolf was an established Airport tenant and flight-training provider, the City knew Wolf's protected status, and Wolf had filed its MCAD complaint. The 2024 transaction was a fresh exercise of municipal leasing discretion after a prolonged lapse, even if the City labeled it a renewal.

58. The FAA record states that the City had no formal written policy requiring a bid for aeronautical office space and instead relied on an informal practice favoring an existing tenant in good standing. The same record disclosed both the seventeen-month lapse and inconsistent City characterizations of the 2024 instrument as a renewal and as a new lease.

59. Fly Lugu later moved or substantially expanded into a separate Airport facility with office, hangar, and aircraft-parking capacity while continuing to retain Office 111. Continued control of the uniquely visible first-floor flight-school office prevented the only competing flight school from obtaining it.

60. On information and belief, the City's decision to preserve Fly Lugu's control of Office 111 despite the lapse and additional facility served at least in substantial part to preserve Fly Lugu's competitive advantage. The current extent of Office 111's use and the related communications are controlled by the City and Fly Lugu.

61. On December 5, 2025, Wolf formally requested Office 111. Before Wolf's Office 208 lease expired on June 15, 2026, Wolf also repeatedly requested a temporary extension or other written certainty while the Office 111 request remained unresolved, including written requests in March and April 2026.

62. The City did not grant the requested temporary extension or provide the requested reasoned determination. On April 27, 2026, it transmitted a proposed three-year Office 208 lease at a higher rate than Fly Lugu's 2024 Office 111 rate and requiring a long-term commitment to Office 208 while documented cooling and comfort problems remained unresolved.

63. Wolf's lapse therefore followed timely efforts to secure continuity and the City's refusal to provide the requested interim arrangement. Fly Lugu, in contrast, was allowed to occupy Office 111 through an approximately seventeen-month lapse and then obtained a three-year instrument. Calling both businesses holdovers does not make the causes, duration, City response, terms, and resulting security materially alike.

***F. The NEAM Simulator and William P. Gonet***

64. Wolf began at KBAF as a flight-simulation business and had already invested in, operated, and developed demand for simulator training before the NEAM transaction described below.

65. During communications and a meeting with NEAM between March 28 and April 7, 2023 and December 11, 2024, Wolf asked whether it could purchase NEAM's Redbird FMX full-motion simulator. A NEAM representative responded that NEAM was already planning on moving the simulator to KBAF for use by Fly Lugu.

66. NEAM later moved and made the simulator available to Fly Lugu at KBAF. The arrangement gave Fly Lugu a valuable simulator capability, institutional affiliation, visibility, and an additional training and referral channel within the same Airport market.

67. William P. Gonet simultaneously served as Chair of the Airport Commission and on NEAM's Board of Directors, including in a NEAM leadership role during the relevant period.

68. At a private function, one or more identifiable attendees heard Gonet state words to the effect that he had made the simulator placement at the Airport happen.

69. Gonet's reported statement, his simultaneous leadership roles, Wolf's earlier purchase inquiry, and the later placement at KBAF for Fly Lugu support a reasonable inference that Gonet materially facilitated the transaction. On information and belief, he was its principal facilitator; discovery will determine the precise role and whether he was the sole facilitator.

70. On information and belief, Gonet used access, relationships, information, coordination, or influence associated with his Commission chairmanship to facilitate placement of the simulator in the Airport environment for Fly Lugu. The communications, meetings, approvals, recusal records, and selection criteria bearing on the capacity in which he acted are held by Gonet, the City, NEAM, or Fly Lugu.

71. Plaintiffs do not rely on Gonet's overlapping titles alone and do not allege that the City generally controlled NEAM. They rely on his reported statement and the surrounding facts as evidence of actual participation, official-source influence, motive, and a recurring Airport-linked opportunity conferred on Fly Lugu.

72. This episode is pleaded as part of the protected-status pattern and as a subject on which internal records are necessary. It is not the transaction-specific comparator supporting Count II, and Plaintiffs do not allege that the FAA found a violation on the NEAM issue.

### *G. Terminal-Adjacent Tiedown Access and the FAA Finding*

73. Atlantic's written tiedown licenses with Fly Lugu expired in October 2022. They granted nonexclusive use of ramp designated by Atlantic from time to time and did not grant Fly Lugu exclusive control of two identified positions.

74. Fly Lugu nevertheless continued using two specific terminal-adjacent positions near exterior electrical outlets and received the operational convenience and commercial visibility associated with those positions.

75. On July 11, 2023, Wolf asked about terminal-adjacent tiedown space. Atlantic initially offered adjacent space for $100 per month. Wolf requested an equal rate to Fly Lugu’s rate ($70 per month), but was denied.

76. On September 5, 2024, Wolf again requested terminal-adjacent tiedown space. Atlantic then stated that it was not entering new tiedown agreements because of planned ramp

redevelopment and withdrew or revoked the opportunity. The asserted redevelopment restriction foreclosed Wolf while Fly Lugu retained the two positions under expired, nonexclusive licenses.

77. No active exclusive license, material safety or qualification difference, inability to pay, or lack of comparable flight-training need distinguished Fly Lugu from Wolf for that allocation.

78. Wolf also requested electrical access at its existing tiedowns or another Airport location. The FAA record found no City response while Fly Lugu continued using power accessible from its terminal-adjacent positions.

79. By the Part 16 proceeding, the City had actual notice that the Fly Lugu licenses had expired, were nonexclusive, and did not designate the two positions. Airport management asked Atlantic about the licenses and commercial terms, and Atlantic confirmed a legacy arrangement associated with the expired agreements.

80. The City nevertheless defended and maintained the disparity rather than exercising its retained sponsor and oversight authority to require a neutral allocation. The decision was not a mere lack of knowledge about private conduct.

81. The FAA found that the expired, nonexclusive licenses undermined the justification for Fly Lugu's control of the positions and that the City failed to justify how those agreements permitted one subtenant to control two specific positions while denying the same opportunity to similarly situated Wolf.

82. The Director expressly found that the City violated Grant Assurances 22 and 23 by failing to act concerning Atlantic's preferential treatment of Fly Lugu, that the treatment unjustly discriminated against similarly situated Wolf, and that it created an exclusive right unsupported by a valid agreement granting exclusive use.

83. Although the FAA standard differs from the constitutional standard and the City's appeal remains pending, the underlying transaction-specific findings make Wolf's pleaded similarity, differential treatment, and absence of the asserted contractual distinction concrete rather than speculative.

84. The City's knowing maintenance of that arrangement after actual notice, together with the application of the redevelopment rationale to Wolf but not to Fly Lugu, supports an inference of intentional differential treatment, bad faith, malice toward Wolf, and gross abuse of public-Airport authority.

***H. Pattern and Discriminatory Intent***

85. Fly Lugu was not LGBTQ-owned or LGBTQ-operated during the relevant period, on information and belief. The City knew that Wolf was owned and operated by LGBTQ persons because Sascha Wolf and Cody Hodgins disclosed that fact directly to the Commission.

86. Across distinct Airport-related channels, the practical result repeatedly favored the same competitor: Wright Flight's compensated-flight pipeline, approximately two years of roadside exposure, first-floor terminal placement, the NEAM simulator arrangement, and terminal-adjacent tiedown and electrical access.

87. Wolf's corresponding requests were rejected, stalled, withdrawn, or not evaluated under a disclosed neutral standard. Plaintiffs do not allege that repetition alone proves conspiracy or that every episode independently establishes a constitutional violation.

88. Discriminatory purpose is inferred from the total circumstances: actual knowledge of protected status; the chronology after disclosure; the same two competitors and small group of Airport decisionmakers; departures from, absence of, or selective use of procedures; inconsistent explanations; dual public-private roles; prolonged tolerance of expired arrangements; and persistence after repeated notice.

89. The tiedown transaction is especially probative because the claimed license distinction failed factual review: the agreements had expired, were nonexclusive, and did not confer the two designated exclusive positions, yet the unequal allocation continued even after the FAA ordered corrective action.

90. No direct admission or anti-LGBTQ slur is necessary to infer intent from those objective facts. The recurring use of public or delegated Airport authority to preserve benefits for one direct competitor while withholding materially comparable access from the other supports an inference of protected-status discrimination rather than coincidence or isolated administrative error.

91. The private Pilots of KBAF Facebook group is not pleaded as an independent City action merely because it used the Airport identifier. Any private-group activity is background only. Plaintiffs rely on City-controlled communications only to the extent the evidence shows an official municipal act or decision.

***I. Specific Retaliatory Sequence***

92. Wolf's MCAD complaint, Plaintiffs' complaints to public officials, their participation in public meetings and records processes, Wolf's Part 16 filing, and related demands for governmental correction were protected speech and petitioning concerning discrimination and operation of a public airport.

93. Sascha Wolf and Cody Hodgins personally made or supported those complaints. Relevant City and Airport decisionmakers received or participated in the matters and knew of the protected activity before the later acts identified below.

94. After the MCAD filing, Wolf submitted its roadway-sign application, obtained Board of Public Works approval, and remained unable to obtain the required Airport approval while Fly Lugu had already received approximately two years of unapproved exposure.

95. In September 2024, Wolf's terminal-adjacent tiedown opportunity was withdrawn while Fly Lugu retained the positions under expired nonexclusive licenses. After the City learned the material facts, it maintained or defended the disparity; the FAA later found the City's failure to act discriminatory under Grant Assurances 22 and 23.

96. On June 26, 2025, following a private aircraft-assistance dispute involving AeroDesign (under the same ownership as Fly Lugu) and Tom Trudeau, an associate of AeroDesign, and Wolf's resulting complaint, Interim Airport Manager Jeffrey Lovejoy distributed a written communication to all Airport tenants that attributed an aircraft-assistance demand or policy to Wolf. Wolf objected that the communication was inaccurate and publicly singled it out. Airport management later retracted the communication and substituted the Airport Emergency Plan procedure.

97. After Wolf's November 27, 2025 Part 16 filing, Wolf requested Office 111 on December 5, 2025 and requested temporary Office 208 certainty before its lease expired. The City did not grant the requested interim arrangement, sent a materially different three-year proposal on April 27, 2026, and allowed Wolf's lease to expire on June 15, 2026 while the dispute remained unresolved.

98. Those specific acts affected Wolf's visibility, operating access, lease security, commercial position, and standing in the Airport community and would deter a person or small Airport business of ordinary firmness from continuing to speak, petition, seek records, or pursue administrative relief.

99. Causation rests on more than timing: actual decisionmaker knowledge, repeated adverse decisions after escalating complaints, transaction-specific comparator treatment, procedural departures or absent criteria, deficient explanations, and the persistence of the FAA-documented tiedown disparity after the City investigated it.

100. The retaliatory course was undertaken, approved, maintained, or ratified through particular Commission decisions and Airport-management conduct within delegated authority. Wolf suffered direct business injury; Sascha Wolf and Cody Hodgins suffered direct chilling, reputational, emotional, and constitutional injury from retaliation against their own protected activity.

### *J. Injury and Damages*

101. Wolf suffered lost net profits, increased operating costs, lost access and commercial opportunity, management diversion, delayed growth, reputational market distortion, and impairment of business value from the actionable conduct.

102. Wolf's historical receipts do not by themselves define but-for performance because the challenged conditions allegedly altered the customer-acquisition and operating environment that generated those receipts.

103. Fly Lugu's contemporaneous performance is relevant because it was the only competing flight-training provider in the same Airport market. Any comparison will adjust for tenure, fleet, instructors, prices, capacity, costs, facilities, and other material differences rather than equating gross revenue with damages.

104. Wright Flight referrals, roadway exposure, ramp visibility, terminal placement, simulator opportunity, and tiedown or electrical access reach different audiences or affect different stages of acquisition and service. Damages analysis will trace causation by channel and eliminate proven overlap rather than presume that all channels produced the same students.

105. The amount of damages will be established through the parties' and comparator's records, fact discovery, and expert analysis. Wolf does not plead a fixed damages amount at this stage. Sascha Wolf and Cody Hodgins seek only their direct personal damages on Count III and do not seek Wolf's corporate losses.

**COUNT I**

**42 U.S.C. Section 1983 - Fourteenth Amendment Equal Protection**

**Protected-Status and Associational Discrimination**

**(Wolf v. City)**

106. Wolf incorporates the preceding paragraphs.

107. The City acted under color of state law through the Commission, Airport management, and officials exercising authority over City-owned Airport property and privileges.

108. Wolf was entitled to equal protection and to be free from intentional adverse governmental treatment because of the known sexual orientation of its owners, operators, and principal representatives and its association with them.

109. The City intentionally treated Wolf less favorably in the process, terms, availability, and continuity of Airport access and commercial privileges. The tiedown transaction supplies a concrete instance in which the only two KBAF flight schools received materially different treatment and the asserted contractual distinction failed FAA review.

110. Protected status and association were motivating factors. Intent is plausibly inferred from actual knowledge, chronology, transaction-specific comparator treatment, selective or absent procedures, inconsistent explanations, dual-role participation, prolonged tolerance of expired preferential arrangements, and persistence after notice.

111. Considered as a whole, the conduct constituted invidious discrimination, fundamental procedural unfairness, and gross abuse of governmental power rather than a routine disagreement over a permit or discretionary benefit.

112. The constitutional injury was caused by final Commission decisions, implementation by Airport management, and knowing municipal approval or ratification by

officials with authority over the challenged subjects. Wolf suffered direct business and property injury and is entitled to all available relief under Section 1983.

**COUNT II**

**42 U.S.C. Section 1983 - Fourteenth Amendment Equal Protection**

**Class of One - Terminal-Adjacent Tiedown Access**

**(Wolf v. City)**

113. Wolf incorporates the preceding paragraphs and pleads this count in the alternative to Count I.

114. For the discrete tiedown allocation, Wolf and Fly Lugu were alike to the high degree required: they were the only two KBAF flight-training providers, operated training aircraft, sought or used tiedown access in the same terminal-adjacent area, and operated under the same fixed-base-operator and City oversight structure.

115. Earlier arrival did not materially distinguish Fly Lugu because no active agreement granted it exclusive rights to the two positions. The expired agreements were nonexclusive, did not designate the two positions, and permitted Atlantic to designate ramp space from time to time.

116. The City intentionally treated Wolf differently by knowingly maintaining Fly Lugu's exclusive use after Wolf's comparable opportunity was withdrawn. The redevelopment explanation was applied to Wolf but did not displace Fly Lugu.

117. The differential treatment lacked a rational relationship to a legitimate governmental purpose. No valid exclusive lease, material safety or qualification difference, refusal by Wolf to accept the same valid terms applied to Fly Lugu, inability to pay, or lack of capacity justified reserving the two positions to Fly Lugu.

118. The FAA independently found preferential treatment of Fly Lugu, unjust discrimination against similarly situated Wolf, and an exclusive right unsupported by a valid agreement granting exclusive use.

119. Maintaining the disparity through expired nonexclusive instruments, applying inconsistent explanations, and declining to correct it after actual notice constituted a gross abuse of public-Airport authority and was motivated by bad faith or malice toward Wolf.

120. The City's final decisions, knowing maintenance, and ratification were a moving force behind Wolf's direct economic and property injury. Wolf is entitled to all available relief under Section 1983.

**COUNT III**

**42 U.S.C. Section 1983 - First Amendment Retaliation**

**(All Plaintiffs v. City)**

121. Plaintiffs incorporate the preceding paragraphs.

122. Plaintiffs engaged in protected speech and petitioning by opposing alleged discrimination, addressing operation of a public airport, communicating with officials, participating in public and records processes, filing or supporting the MCAD and Part 16 proceedings, and demanding governmental correction.

123. Relevant Commission members and Airport personnel knew of that protected activity before the specific later actions concerning signage, tiedown and electrical access, the June 26, 2025 tenant communication, and lease continuity.

124. The City thereafter denied, delayed, maintained, approved, or ratified those specific adverse actions. They materially affected Airport access, visibility, lease security, business operations, reputation, and Plaintiffs' ability and willingness to continue petitioning.

125. Protected activity was a substantial or motivating factor. Causation is plausibly inferred from actual knowledge, sequence, comparator treatment, procedural departures or absent criteria, deficient explanations, and persistence of the FAA-documented tiedown disparity after escalating complaints.

126. The adverse actions would deter a person or similarly situated small Airport business of ordinary firmness from continuing to speak, petition, request records, or pursue administrative relief.

127. The retaliation resulted from particular Commission decisions and Airport-management conduct implemented, approved, or ratified within municipal authority. Wolf suffered direct business and property injury, and Sascha Wolf and Cody Hodgins suffered direct injuries from retaliation against their own protected activity.

**COUNT IV**

**G.L. c. 151B, Sections 4(8), 4(4), and 4(4A)**

**Commercial-Space Discrimination, Retaliation, and Interference**

**(Wolf v. City)**

128. Wolf incorporates the preceding paragraphs.

129. The City owned, leased, managed, or controlled commercial space and the terms, privileges, facilities, and services connected with commercial space at KBAF, including terminal offices, signage approval, ramp and tiedown access, electrical access, and lease continuity.

130. Wolf sought, leased, occupied, or attempted to obtain that commercial space and those connected privileges, facilities, or services after the City knew Wolf was owned and operated by LGBTQ persons.

131. The City denied, withheld, delayed, restricted, or imposed materially different treatment concerning those facilities and services because of the sexual orientation of the persons

through whom Wolf sought and used the space and because Wolf opposed alleged discrimination.

132. Wolf filed its MCAD complaint and later amendments or supplemental allegations concerning the same course of commercial-space-related treatment and retaliation. More than ninety days elapsed before this action; the MCAD matter ended without a final merits determination and is no longer pending.

133. The City's conduct caused Wolf loss of money, property, access, and opportunity. Wolf is entitled to the compensatory, equitable, fee, cost, interest, and other relief authorized by Chapter 151B.

**COUNT V**

**G.L. c. 93A, Sections 2 and 11**

**Unfair or Deceptive Acts and Unfair Methods of Competition**

**(Wolf v. City)**

134. Wolf incorporates the preceding paragraphs.

135. Wolf engaged in trade or commerce as a flight-training and simulation business. This count is limited to the City's alleged proprietary and commercial-landlord conduct, not its exercise of police, safety, permitting, or general regulatory authority.

136. In the conduct challenged by this count, the City marketed and leased revenue-producing Airport offices and privileges, prescribed and negotiated commercial terms, collected rent and fees, managed competing commercial tenants, and contracted with a fixed-base operator concerning commercial Airport services.

137. The City's alleged commercial conduct was unfair or deceptive because it used undisclosed, absent, inconsistent, expired, or selectively applied arrangements to preserve

unequal competitive conditions; made inconsistent characterizations of material leasing arrangements; and maintained a documented preferential allocation after notice.

138. That conduct occurred primarily and substantially in Massachusetts and caused Wolf loss of money or property, including lost net profits, increased costs, delayed growth, lost commercial opportunity, management diversion, and impairment of business value.

139. Wolf is entitled to damages, injunctive relief, reasonable attorneys' fees and costs, and multiple damages or other relief only to the extent authorized and proved under Chapter 93A.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Enter judgment in Plaintiffs' favor on the claims proved at trial;

B. Award compensatory and nominal damages established by admissible evidence, allocating corporate and individual injuries to the proper Plaintiff;

C. Declare that the City violated Plaintiffs' constitutional rights to the extent proved;

D. Declare that the conduct proved at trial violated applicable Massachusetts law;

E. Enjoin the City from discrimination or retaliation and require neutral, consistently applied procedures for material Airport access, leasing, tiedown, signage, conflict, and complaint decisions;

F. Require neutral reconsideration of Wolf's requests for tiedown, electrical, signage, lease, and other Airport access without impairing any nonparty's rights without due process;

G. Award multiple damages only to the extent legally authorized and proved;

H. Award reasonable attorneys' fees, costs, and prejudgment and post-judgment interest as allowed by law; and

I. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 16, 2026

WOLF AVIATION NETWORK, INC.,
SASCHA WOLF, and CODY HODGINS,
By their attorneys,

*/s/ Tyler E. Chapman*

Tyler E. Chapman (BBO # 637852)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
tchapman@toddweld.com